**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.** 1:26-mj-03756-Reid

**UNITED STATES OF AMERICA**

**vs.**

**JIMMY JOHN WINDSOR III,**

**Defendant.**
_______________________________/

FILED BY cdb01 D.C.
Sep 23, 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**CRIMINAL COVER SHEET**

1. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? **NO**

2. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? **NO**

3. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? **NO**

4. Did this matter involve the participation of or consultation with Magistrate Judge Yeney Hernandez during her tenure at the U.S. Attorney's Office, which concluded on April 3, 2026? **NO**

5. Did this matter involve the participation of or consultation with Magistrate Judge Brandy Brentari Galler during her tenure at the U.S. Attorney's Office, which concluded on July 30, 2026? **NO**

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: [signature]
Monique Botero
Assistant U.S. Attorney
Florida Bar No. 722286
U.S. Attorney's Office – SDFL
99 NE 4th Street
Miami, FL 33132
Telephone: 305-961-9010
Email: Monique.Botero@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

FILED BY CDB01 D.C.

Sep 23, 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

United States of America
v.
JIMMY JOHN WINDSOR III,
*Defendant(s)*

Case No. 1:26-mj-03756-Reid

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 2025-September 23, 2026 in the county of Miami-Dade in the Southern District of Florida, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to possess with intent to distribute controlled substances |
| 18 U.S.C. § 924(c) | Possession of a firearm in furtherance of a drug trafficking offense |
| 18 U.S.C. § 1519 | Destruction of evidence in a Federal investigation |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Special Agent Garrett Canterbury, FBI
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by FaceTime

Date: 9/23/2026

[signature]
*Judge's signature*

City and state: Miami, Florida

Honorable Lisette M. Reid, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Garrett Canterbury, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to a Transnational Organized Crime Squad in the FBI's Miami Division. I have been an FBI Special Agent since August 2025. Before becoming an FBI Special Agent, I worked as a Staff Operations Specialist with the FBI from June 2022 until August 2025. In that role, I received training and assisted in complex FBI criminal and national security investigations involving Indian Country offenses, international kidnappings for ransom, hostage-taking, and international fugitives, among others. During my Special Agent training at the FBI Academy in Quantico, Virginia, I received training on a variety of investigative and legal matters, including Fourth Amendment searches, drafting search warrants and affidavits, and probable cause. My duties involve investigating a variety of violations of federal laws, including, but not limited to, drug offenses, interstate transportation of stolen property, major theft, and money laundering. Based on my training and consultation with experienced FBI Special Agents and United States Postal Inspectors, I am familiar with how U.S. Mail is used to send, receive, and traffic illegal narcotics.

2. I submit this affidavit for the limited purpose of establishing probable cause that (1) from in and around January 2025, through on or about September 23, 2026, Jimmy John Windsor III (hereinafter, "WINDSOR") conspired to possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 846; (2) on or about September 23, 2026, WINDSOR possessed a firearm in furtherance of a drug trafficking offense, in violation of Title 18, Untied States Code, 924(c); and, (3) on or about September 23, 2026, WINDSOR destroyed evidence in a federal investigation, in violation of Title 18, United States Code, Section 1519.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not contain all of the information known to me or other law enforcement officers involved in this investigation. The facts and information contained in this affidavit are based on my personal knowledge and observations, as well as information received in my official capacity from other individuals, including other law enforcement officers involved in this investigation, as well as my review of records, documents, and other physical items obtained during the course of this investigation.

**PROBABLE CAUSE**

4. During a routine parcel profiling exercise conducted by the United States Postal Inspection Service (USPIS) in June 2025, law enforcement identified a suspicious parcel (the "JULY PARCEL") addressed to 3001 SW 2nd Street, Apartment 110C, Miami, FL 33135 ("WINDSOR'S RESIDENCE"). Upon review of United States Postal Service (USPS) records, between approximately January and June 2025, of the approximately 38 parcels addressed to the WINDSOR'S RESIDENCE, 28 of them originated in Southern California. Further, postage for all these parcels was purchased through a third-party online vendor. Additional investigation and examination of open source and law enforcement records led to law enforcement obtaining and executing a search warrant (25-MJ-03464-ELFENBEIN) on the JULY PARCEL addressed to WINDSOR'S RESIDENCE. The JULY PARCEL contained approximately 3.7 kilograms of cannabinoid vape cartridges and more than .5 kilograms of suspected marijuana.

5. In or about December 2025, law enforcement identified another suspicious parcel bearing similar characteristics to the JULY PARCEL, which was being delivered to an unrelated third location, but whose label was purchased alongside a suspicious parcel addressed to the WINDSOR'S RESIDENCE (the "DECEMBER PARCEL"). Law enforcement executed a search

warrant (25-MJ-04364-TORRES) on the DECEMBER PARCEL, which contained approximately 1 kilogram of suspected marijuana.

6. In or about February 2026, USPIS identified another suspicious parcel addressed to WINDSOR'S RESIDENCE (the "FEBRUARY PARCEL"). That parcel bore similar characteristics to the JULY PARCEL and the DECEMBER PARCEL. Law enforcement executed a search warrant (26-mj-02376-HUNT) on the FEBRUARY PARCEL, which contained one pint of a substance labeled Promethazine with Codeine Oral Solution. According to a July 2026 DEA lab report, the substance was unable to be identified. Law enforcement recently requested further laboratory analysis of this substance to further identify it.

7. On or about May 12, 2026, USPIS interdicted another parcel (the "MAY PARCEL") addressed to WINDSOR'S RESIDENCE. That parcel bore characteristics similar to the JULY PARCEL, the DECEMBER PARCEL, and the FEBRUARY PARCEL. Specifically, the MAY PARCEL bore postage purchased through a third-party postage vendor that accepted payment in the form of cryptocurrency. In my training and experience, I know that individuals engaged in narcotics trafficking will commonly use a method of payment that makes it difficult to attribute to a specific sender, to include cryptocurrency.

8. Law enforcement executed a search of the MAY PARCEL (26-mj-03047-REID) on or about June 10, 2026. The recipient information for the MAY PARCEL was as follows:

Recipient: JOHN WINDSOR 3001 SW 2ND ST APT 110C MIAMI FL 33135-2759

9. Upon search of the MAY PARCEL, investigators located a clear vacuum-packed and heat-sealed bag marked "SKY" containing white pills, bearing markings consistent with alprazolam (Xanax). The clear bag of pills was weighed on a calibrated scale, which confirmed a

weight of approximately 1,430g. According to a July 2026 DEA Lab Report, the substance in the pills was identified as Ethylbromazolam.

10. As of March 16, 2026, the DEA enacted a temporary order classifying Bromazolam as a Schedule I substance. Based on my training, experience, and researched information from credible sources, Ethylbromazolam could be classified as an analogue of Bromazolam. Ethylbromazolam is the ethyl homologue of Bromazolam, differing by replacement of the methyl group by an ethyl group at the triazole ring.

11. From approximately June 2025 to as recently as July 18, 2026, USPIS identified approximately 70 parcels addressed to WINDSOR'S RESIDENCE bearing characteristics that are consistent with narcotics trafficking, and similar to the above-mentioned JULY, FEBRUARY, and MAY PARCELS, collectively the "SUSPECT PARCELS." The characteristics may include originating from the Southwest Border, labels with listed "senders" that are either fictitious or could not be verified via open-source, law enforcement, or USPS databases, and/or labels purchased through third-party postage vendors that accept cryptocurrency as a form of payment.

12. A review of USPS mailing records confirmed that WINDSOR'S RESIDENCE has received approximately 30 parcels bearing characteristics commonly associated with narcotics trafficking and/or the SUSPECT PARCELS since January 13, 2026. The most recent of these was delivered to WINDSOR'S RESIDENCE on or about August 29, 2026. This parcel, weighing approximately 13oz, listed the sender as "Urban Peak," at a location in Alameda County, CA. Open-source research indicates that the sender location is a single-family home, not a business location for "Urban Peak." Law enforcement was able to confirm that a business in Dublin, CA does sell customizable trophies and promotional items, including "Urban Peak" products. However, this business is not located at the listed sender address. Further, in my experience, a

company that provides a personalization service would be the "sender" on such products in lieu of the basic material manufacturer.

13. On May 14, 2026, law enforcement conducted surveillance in the area of the TARGET RESIDENCE. At approximately 7:48pm, law enforcement observed WINDSOR leaving the area of his residence, enter his vehicle (Black, 2025, Honda Accord), and drive to the parking lot of the Walgreens located at 2700 W. Flagler Street, Miami, Florida.

14. Upon arrival, law enforcement observed an unknown male enter the front passenger side of WINDSOR'S vehicle. A short time later, the unknown male exited WINDSOR'S vehicle and left the area. WINDSOR also returned to his residence a short time later. On the same date, WINDSOR returned to the Walgreens parking lot later in the evening in WINDSOR'S vehicle and met with another unknown male. The unknown male entered the WINDSOR'S vehicle, similar to the previous subject, and exited a short time later. WINDSOR then returned to his residence.

15. Law enforcement conducted surveillance in the area of the WINDSOR'S RESIDENCE and observed similar activity on July 8 and July 9, 2026. Law enforcement observed WINDSOR meeting with subjects in the same Walgreens parking lot for separate meetings in his vehicle.

16. Based on the narcotics previously seized and attributed to WINDSOR, agents suspected WINDSOR was receiving his supply of narcotics through the mail at WINDSOR'S RESIDENCE. Using this and other evidence, including the activity observed at the Walgreens parking lot, agents sought a federal search warrant for WINDSOR'S RESIDENCE and vehicle. On September 21, 2026, U.S. Magistrate Judge Lisette M. Reid signed a search warrant authorizing the search of WINDSOR'S RESIDENCE and his vehicle. *See* 26-mj-3729-REID.

17. On September 23, 2026, at approximately 5:42 a.m., while preparing to execute a search warrant at WINDSOR'S RESIDENCE, law enforcement observed that interior lights were on inside the residence. At approximately 5:45 a.m., WINDSOR was observed leaving the building of the WINDSOR RESIDENCE and spending a short amount of time outside before returning, at which point the interior lights appeared to turn off. At approximately 6:00 a.m. agents attempted to execute the search warrant at WINDSOR'S RESIDENCE by activating the emergency lights and sirens on several vehicles at the windows parked on the side and rear of the unit, and calling out for WINDSOR and any other occupants to exit the residence using a bullhorn and vehicle-installed public address system.

18. Between approximately 6:00 a.m. and 7:10 a.m., law enforcement made repeated attempts to get WINDSOR to exit the residence through a combination of public address announcements, yelling directions, and knocking on the windows of his home. During this time, law enforcement officers observed activity in the window of the bathroom of the WINDSOR RESIDENCE. A silhouette could be observed in the window moving back and forth and up and down, as if to be reaching down for something. Law enforcement also made at least 50 telephone calls to various numbers listed as belonging to WINDSOR. Many of these calls appeared to ring and then were declined, suggesting that the user of the phone was awake. Law enforcement then made telephonic contact with WINDSOR's mother and father, who used an attorney to convince WINDSOR to exit the residence.

19. WINDSOR exited the residence and was detained around 7:10 a.m., at which point law enforcement cleared the apartment and found no other occupants, confirming that WINDSOR was the subject seen by the window. During the subsequent search, law enforcement found a loaded Glock handgun on a table next to the front door. See image below.



**In Image – Yellow circle: handgun**

20. The residence also had a room that appears to be a base of operation for narcotics distribution. Specifically, this room contained distribution weights of suspected marijuana, boxes of THC vape cartridges, and psylocibin mushrooms in storage bins, dozens of vials of suspected steroids, a heat sealer that had a bag of marijuana inside, bags and baggies of various size, multiple scales and containers with white powder residue, suspected of being cocaine. Adjacent to the desk with the scales, marijuana, and heat sealer was a shotgun, and on a nearby dog crate in the same room, law enforcement also found two rifles with magazines loaded with ammunition. The shelves of this room also held multiple rifle magazines and dozens of additional rounds of ammunition. In this room proximal to the drugs described above, law enforcement also located more than $1,000 in US currency.

See images below on page 8.



**In Image - Yellow circle: marijuana in blue bin, Red circle: marijuana in heat sealer, Green circle: single shot shotgun with empty casing inside, Blue rectangle: two loaded assault rifles**



**Closeup photos of marijuana depicted in image above**

21. During a search of the bathroom, law enforcement identified small chunks of white powder, along with wet white powder and powder residue in and around the floor and drain of the

shower[1]. A field test of this powder returned a presumptive positive for the presence of cocaine hydrochloride. The floor of the bathroom and shower were wet, indicating it was recently being used. Further, WINDSOR complained to law enforcement that he hurt his elbow because he "slipped in the shower," but at the time he exited the residence, he was fully clothed and dry upon exiting the residence. See images of cocaine in shower below.





22. A garbage can in the kitchen of the WINDSOR RESIDENCE was found to contain at least a dozen clear plastic bags of various sizes. Inside the bags, law enforcement found white powder, residue, orange powder, and several other bags contained pills including a round, blue pill consistent with fake oxycodone, commonly referred to as "blues," and white bars, consistent with those seized in the MAY PARCEL. Given that all these bags were wet, it is reasonable to believe that WINDSOR likely dumped the contents of these bags in his toilet and or shower drain during the time between 6:00-7:10 a.m. because he knows that criminal charges for these drugs commonly carry harsher penalties. In the kitchen trash can law enforcement also located multiple empty boxes of Ketamine and one full vial of Ketamine, a Schedule III controlled substance. Later, when

[1] The exterior window where law enforcement observed the activity is directly adjacent to the shower.

WINDSOR was informed of the charges, he uttered "I didn't have any cocaine in there. I just love weed. It's peace and love." He also asked about the approximate weight of cocaine possession for which he was being charged.

23. In addition to the three firearms in the office space and the Glock by the front door, the search also uncovered another rifle in WINDSOR's bedroom which had a loaded magazine and had the safety off, in the "fire" position.[2]

**CONCLUSION**

24. Based on the foregoing facts, I respectfully submit that there is probable cause to support a criminal complaint against WINDSOR for the following violations: Title 21, United States Code, Section 846; Title 18, Untied States Code, 924(c); and Title 18, United States Code, Section 1519.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

SPECIAL AGENT GARRETT CANTERBURY
FEDERAL BUREAU OF INVESTIGATION

Sworn to and attested by FaceTime in accordance with the requirements of Fed. R. Crim. P. 4.1 this 23rd day of September, 2026.

HONORABLE LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

[2] This bedroom also had an exterior window facing towards where law enforcement had positioned with lights, sirens, and public address announcements.